THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRENCE BURNS, Defendant-Appellant.

First District (4th Division)   No. 1—96—3988

Opinion filed March 25, 1999.

2

Michael J. Pelletier and Pamela Z. O'Shea, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Noreen M. Daly, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SOUTH delivered the opinion of the court:

Defendant, Terrence Burns, was charged by indictment with four counts of first degree murder, one count of armed violence, one count of attempted armed robbery, and one count of attempted robbery arising out of the 1995 shooting death of Ethan Kane. Prior to trial, the State nol-prossed the armed violence and attempted robbery charges. Following a jury trial, defendant was found guilty of first degree murder and attempted armed robbery and was sentenced to a term of 40 years on the murder conviction and a consecutive 10-year term on the attempted armed robbery conviction.

On December 3, 1995, Ethan Kane was murdered in the alley behind his home at 2038 North Mohawk in Chicago, Illinois. At trial, Seth Nichols, a friend of the victim's, testified that he and the victim were parked in a van when they were approached by two black men with guns. One man came to the driver's side of the van and pointed a gun at him through the glass. Nichols stated that he exited the van after one of the offenders opened the car door and hit him. Nichols heard a scuffle taking place on the other side of the van and then he heard the victim say, "Please don't shoot me." Nichols moved toward the front of the van, where he saw the victim struggling with the other offender and then saw the offender shoot the victim. Both offenders ran down the alley as the victim fell to the ground.

Kevin O'Shea testified that he lived near the scene of the shooting when he looked out of his bedroom window after hearing five gunshots. He observed a red, two-door Pontiac Grand Am parked and idling in an alley. Then two people ran up to the car and got into the car. When the car door opened, O'Shea could see that the occupants were three black males in their teens to late twenties. The car then sped southbound toward Armitage.

Detective Terrence O'Connor testified that, after an extensive investigation, he went to defendant's house to speak with him. When he arrived at defendant's home, he told defendant that he was investigating a murder and that his name had come up. Defendant agreed to go to the police station because he did not want to talk in front of his mother.

At the police station, defendant told Detective O'Connor that, on the night of the murder, he had been on his back porch and heard gunshots and assumed that they were related to the incident. Defendant lived six blocks from where the murder took place. Defendant also told him that he knew the men who attempted the robbery and

shot the victim. O'Connor testified that eventually defendant told him that he was with "O'Tree" and "Top Dog" on the night of the incident and acted as the lookout.

Defendant told Detective O'Connor that at approximately 3:45 the morning of the murder, O'Tree, Top Dog, and James Lawrence, also known as "Jinx," picked him up in a two-door red car. They were all members of the Blackstone gang. O'Tree showed them a loaded .380-caliber handgun and said that he wanted to do some robberies and get some money. They drove to the Lincoln Park area to find someone to rob. When they spotted a van pulling into the alley of Armitage between Larrabee and Mohawk, they agreed that defendant would act as the lookout while the other two did the robbery. O'Tree and Top Dog approached the van and threatened two people in the van. O'Tree got into a struggle with one of the people and shot the victim. O'Tree and Top Dog ran back to the car and the three of them drove away from the alley. O'Connor testified that defendant felt he was entitled to some of the robbery proceeds.

After interviewing defendant, O'Connor and his partner interviewed James Lawrence about the events of that night. After speaking with him, the police contacted the felony review unit of the office of the Cook County State's Attorney.

Assistant State's Attorney (ASA) Ann Lorenz testified she interviewed defendant and James Lawrence. After she advised defendant of his *Miranda* rights, he waived them and agreed to speak to her. ASA Lorenz then reduced defendant's statement to writing, which he signed and initialed with some corrections that reflected his version of the events that night. Defendant made several corrections to the statement and placed his signature on the statement nine times. ASA Lorenz testified she never saw handcuffs on defendant and he never asked to go home. She also stated that defendant indicated the police were treating him properly.

ASA Lorenz also spoke with James Lawrence about the incident; although he was not a suspect, he agreed to speak with her. His statement was similar to defendant's up to the point when Lawrence said he got out of the car before the other three went to Lincoln Park. Lorenz reduced his statement to writing and allowed him to initial any corrections.

At trial, ASA Lorenz published both statements to the jury. When James Lawrence testified, he admitted he was a member of the Blackstones gang and that he knew O'Tree and Top Dog and that they were members of the Blackstones but that defendant was not a member. Lawrence identified the written statement he gave to ASA Lorenz, his signatures and initials, but denied making or reading the statement.

He stated he only signed the statement because the police beat him outside the presence of ASA Lorenz.

Waltarasha Jackson testified she knew O'Tree, Top Dog, Jinx, and defendant from the neighborhood and knew them all to be Blackstones. She stated that around 7 p.m. on December 1, 1995, she saw O'Tree and Top Dog in a red car owned by O'Tree's sister.

Dana Redmond testified that on December 2, 1995, O'Tree was arrested at about 9 p.m. for hitting her in the face. On cross-examination, defense counsel established that as a result of Redmond's criminal complaint, O'Tree was at the police station; however, Redmond did not know what time O'Tree was released.

Defendant testified that he knew Top Dog and O'Tree and would sometimes go to Blackstone meetings on Friday nights behind the Manierre school. However, he denied being in the gang.

Defendant further testified that he did not recall where he was in the early morning hours of December 3, 1995. On December 26, 1995, Detective O'Connor came to his home at about 10:30 a.m. and, without explanation, demanded that defendant come with him. Defendant stated that the police did not handcuff him until after he told them he knew nothing about the murder. At that point, defendant said the police kept tightening the handcuffs until he signed the statement.

Defendant denied ever telling the police that he was involved in Ethan Kane's murder. He also denied telling ASA Lorenz anything about the murder. He maintained that he was at the police station two days before being charged. Further, he denied ever reading the statement that bears his signature and denied that anyone else read it to him. He said that he only signed the statement because Detective O'Connor and ASA Lorenz told him that he could go home if he did.

In rebuttal, ASA Lorenz testified that all of the information came from defendant. She further testified that her conversation with defendant occurred on December 27, 1995, and that defendant had told her that he arrived at the police station at 11 a.m. that day. She also stated that defendant was never told that he could go home if he signed the statement.

Defendant argues that, before the trial commenced, relatives of the decedent sat near a juror and possibly held a conversation with the juror.

After the State presented two witnesses, during a court recess, defense counsel informed the court that a juror was seen having a conversation with the victim's family. The court allowed defense counsel to call witnesses to testify about what they observed before calling out the juror.

Elmore Burns, one of defendant's relatives, was sworn and testi-

fied that the decedent's family was seated near the rear of the courtroom, and a woman who was eventually selected for the jury was sitting near them. Burns further related that the juror was talking with some of them for about 15 to 20 minutes, but he could not identify whom the juror was talking to or if the individuals were in fact the decedent's family members. Burns also stated that there were other jurors all around. However, Burns also stated that he did not see anybody in the family with whom the juror was specifically speaking. When questioned further, Burns could not state or recall if the prospective juror spoke to any family member of the decedent. He only remembered that the person did not have on a "juror sticker."

Defense counsel requested that the court question the juror but the court denied the request. The trial court ruled that, based upon the evidence presented, the allegations were so vague they did not warrant any further inquiry. On appeal, defendant argues that the allegations of extraneous communication between one of the jurors and some members of decedent's family was prejudicial and that the trial court's failure to make specific inquiry of her entitles him to a new trial.

■ It is well settled in Illinois that any communication with a juror during trial about a matter pending before the jury is deemed presumptively prejudicial to a defendant's right to a fair trial. Although this presumption of prejudice is not conclusive, the burden rests upon the State to establish that such contact with the jurors was harmless to the defendant. *People v. Harris*, 123 Ill. 2d 113, 132 (1988), citing *Remmer v. United States*, 347 U.S. 227, 229, 98 L. Ed. 654, 655, 74 S. Ct. 450, 451 (1954). Parties and other persons connected with a case or having some interest therein, including counsel, witnesses, and relatives of parties, should carefully avoid private conversations and social intercourse with jurors. §§ 75 Am. Jur. 2d *Trial* §§ 1005, 1008 (1974); *People v. Kelly*, 24 Ill. App. 3d 1018, 1033 (1975). A reversal or a new trial will not be ordered because of a conversation between a juror and a third person that is of a harmless character and unrelated to the case. *People v. Strause*, 290 Ill. 259, 285-89 (1919). The trial court has substantial discretion in determining whether an improper contact with a juror has caused prejudice to the defendant. *People v. Harris*, 123 Ill. 2d 113, 132 (1988). A verdict will not be set aside where it is obvious that no prejudice resulted from a communication to the jury, either by the court or by third persons outside the presence of the defendant. See *Harris*, 123 Ill. 2d at 132; *People v. Buckhana*, 99 Ill. App. 3d 889 (1981).

■ Here, the trial court found that the contact, if any, between the juror and the decedent's family was not prejudicial to the defendant.

There are no other facts that indicate that the trial court abused its discretion. Defendant argues that *Remmer v. United States*, 347 U.S. 227, 98 L. Ed. 654, 74 S. Ct. 450 (1954), *People v. Peterson*, 15 Ill. App. 3d 110 (1973), and *People v. Mitchell*, 121 Ill. App. 3d 193 (1984), are analogous to this case and their holdings require remandment for a new trial.

In *Mitchell*, a prospective juror in a burglary case lied under oath about having been the victim of a burglary. When the matter was brought to the trial court's attention, the court refused to reopen *voir dire* at the request of defense counsel. The court found this to be specific, detailed and nonconjectural evidence of bias. Therefore, it was error for the trial court not to make at least a limited inquiry into the incident. *Mitchell*, 121 Ill. App. 3d at 195-96.

In *Peterson*, after being sworn, a juror indicated to defense counsel that she " 'was praying that the defendants will plead guilty' so she could go home." *Peterson*, 15 Ill. App. 3d at 110. The trial court refused to reopen *voir dire* in this case or excuse the juror. The court found that "the remark itself vitiates any previous conclusion made as to impartiality." *Peterson*, 15 Ill. App. 3d at 111.

These cases are distinguishable from the instant case. Here, the information brought forth by defense counsel was vague at best. After extensive questioning of Elmore Burns, the alleged eyewitness to the improper conversation, the probability that any contact between a juror and a member of decedent's family was low. In this case, Elmore Burns could not identify any person the juror spoke to nor was he certain that the person whom the juror spoke to was actually a member of the decedent's family. When Burns was asked to describe what he observed, he could not remember what, if anything, he noticed. Burns' testimony was considerably less reliable than the specific, detailed and nonconjectural evidence standard set forth in *Mitchell*. Therefore, there was not a sufficient basis that the court could reasonably rely upon to justify questioning the juror. Absent any clear evidence that there existed any improper communication between a prospective juror and a member of the decedent's family, it must be presumed that the jury followed the judge's instruction and reached a verdict based solely on the evidence placed before it. See *People v. Harris*, 123 Ill. 2d 113, 134 (1988); *People v. Silagy*, 116 Ill. 2d 357 (1987).

There is no basis in the record for disregarding the trial court's decision on whether to risk tainting the jury by reopening *voir dire* on the mere speculation that the juror might have had a conversation with the Kane family. Further, as the trial court noted, the juror responded candidly when asked during *voir dire* if she could be impartial toward both sides. The trial court had the opportunity to

view the demeanor of the juror; therefore, this court should defer to the trial court's decision not to question the juror. We do not find the court abused its discretion.

Defendant next asserts that the trial court committed reversible error when it denied his counsel the opportunity to present testimony from alibi witness Felix Davenport.

The record reveals that, prior to trial, defendant's attorney informed the court that the defense to the charges was only as to the sufficiency of the evidence. Furthermore, counsel specifically stated that there would be no affirmative defenses as late as eight days prior to the commencement of the trial. When counsel did respond to the State's discovery request, the response included Felix Davenport, with a Chicago address, as a possible witness.

On September 17, 1995, after the trial began and the State was presenting its case, defendant made a motion to amend his discovery to include Felix Davenport as an alibi witness. Defense counsel explained that he did not know about the witness until sometime after September 9. However, counsel never indicated that he would be using an alibi defense prior to this time. Defense counsel generally offered that the witness would testify that defendant was with him on the evening of the murder. The court refused to allow Felix Davenport to testify as an alibi witness based upon prejudice to the State and defense counsel's noncompliance with discovery rules. However, the court allowed defendant to testify about an alibi if he chose to do so.

■ Supreme Court Rule 413(d) provides:

"Defenses. Subject to constitutional limitations and within a reasonable time after the filing of a written motion by the State, defense counsel shall inform the State of any defenses which he intends to make at a hearing or trial." 134 Ill. 2d R. 413(d).

■ Supreme Court Rule 415(g)(i) provides:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule *** the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." 134 Ill. 2d R. 415(g)(i).

■ The purpose of the discovery rules "is to prevent surprise or unfair advantage and to aid in the search for the truth." *People v. Daniels*, 75 Ill. App. 3d 35, 41, 393 N.E.2d 667, 673 (1979). Sanctions are designed to accomplish the purpose of discovery, but it is clear that the imposition of sanctions should not encroach on a fair trial. *People v. Rayford*, 43 Ill. App. 3d 283 (1976). Exclusion of alibi testimony has

been recognized as an appropriate exercise of the trial court's discretionary authority under Rule 415(g). See *People v. Morris*, 229 Ill. App. 3d 144, 164 (1992). The Illinois Supreme Court has found no abuse of discretion in a trial court's preclusion of alibi testimony. *People v. Morgan*, 142 Ill. 2d 410, 568 N.E.2d 755 (1991), *cert. granted*, 502 U.S. 905, 116 L. Ed. 2d 239, 112 S. Ct. 295 (1992).

In the instant case, defense counsel never provided the State or the court with information regarding defendant's alibi defense as required by Supreme Court Rule 413(d). The record indicates that defense counsel knew of Felix Davenport's alleged alibi for defendant all along and, despite his contentions, had adequate opportunity to disclose the defense. In fact, the record is clear that Felix Davenport's name appeared as a possible witness but defendant purposefully and unequivocally indicated that he was not presenting any affirmative defenses.

Defendant relies heavily on *People v. Foster*, 145 Ill. App. 3d 477 (1986), in support of his contention that the exclusion of Felix Davenport's testimony was too harsh a sanction. In *Foster*, prior to jury selection, defendant's attorney requested permission to amend the discovery answer to add another witness. The State objected, but the trial court reserved its ruling. The court later denied defendant's motion as a sanction for failure to name the witness on the initial discovery answer. This court found the sanction an abuse of discretion because the record showed that the initial failure to list the witness was unintentional, and the record indicated that the witness' exculpatory testimony was material to defendant's case and its exclusion prejudicial to defendant. *Foster*, 145 Ill. App. 3d at 481.

Defendant also analogizes this case to *People v. Jackson*, 48 Ill. App. 3d 769, 363 N.E.2d 392 (1977). In *Jackson*, the court denied defense counsel's motion to call 14 witnesses not previously disclosed to the State after the State rested its case in chief. Defendants testified that they were all at different locations when the crime took place and the other witnesses were needed to establish or corroborate their alibis. Further, they were witnesses known to the State and their identities could have been disclosed to defendants in response to their discovery motion. Therefore, the court found the exclusion of all of the witnesses reversible error. *Jackson*, 48 Ill. App. 3d at 771.

■ This case is distinguishable from *Foster* because, here, there is no evidence that defense counsel's failure to inform the court or the State of the affirmative alibi defense was unintentional. In fact, from the record it appears that it was a tactical decision to wait until the last minute to reveal this defense. The case is also distinguishable from *Jackson* because the defendants testified to their own alibis and

needed these witnesses to corroborate their versions of events. Further, the court found that the State had control over the undisclosed witnesses because they were all fellow inmates of defendants. In this case, defendant did not have an alibi in defense to the charges. Although he testified that he did not recall his whereabouts on the night of the murder, nothing in the record corroborates his story. Felix Davenport, on the other hand, allegedly would testify that defendant was with him. However, this testimony does not corroborate defendant's testimony. Furthermore, no offer of proof was made by defense counsel as to what exactly Davenport would have testified to with respect to the alibi. We have no time frame in the record, so it is speculative at best as to what Davenport would have testified.

This issue was discussed in *Taylor v. Illinois*, 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646 (1988). In *Taylor*, on the second day of trial, the defense attorney made an oral motion to amend his discovery answers to include two additional witnesses. Upon inquiry from the trial judge as to why the motion should be granted, counsel represented that he had just been informed about these witnesses. The following day, the first witness appeared for an offer of proof and revealed that he had actually met with defense counsel a week before the trial started. The trial judge then did not allow either of the witnesses to testify due to defense counsel's blatant violation of discovery rules. The Supreme Court affirmed the trial court's exclusionary sanction. The Court reasoned that the sanction of preclusion serves an important purpose, noting:

> "One of the purposes of the discovery rule itself is to minimize the risk that fabricated testimony will be believed. Defendants who are willing to fabricate a defense may also be willing to fabricate excuses for failing to comply with a discovery requirement. The risk of a contempt violation may seem trivial to a defendant facing the threat of imprisonment for a term of years. A dishonest client can mislead an honest attorney, and there are occasions when an attorney assumes that the duty of loyalty to the client outweighs elementary obligations to the court." *Taylor*, 484 U.S. at 413-14, 98 L. Ed. 2d at 813, 108 S. Ct. at 655.

In this case, the court obviously felt that preclusion was the only effective sanction. That decision was clearly not an abuse of its discretion.

Lastly, defendant claims that defense counsel was ineffective for failing to timely disclose the alibi testimony. He further contends that counsel was ineffective because he did not present testimony from a police officer to prove that defendant's accomplice was in jail at the time of the offense.

■ *Strickland v. Washington* sets forth the standard for determining whether there exists an ineffective assistance of counsel claim. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *Strickland* established a two-prong test for judging attorney performance: first, defendant must show that counsel's performance was deficient; and second, that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65. A strong presumption exists that defense counsel's performance falls within the "wide range of reasonable professional assistance" and, thus, is not deficient. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. The *Strickland* test also requires a "reasonable probability of a different result, not merely a possibility of a different result." *People v. Gacy*, 125 Ill. 2d 117, 129-30, 530 N.E.2d 1340 (1988).

■ Defendant claims that counsel was ineffective because he failed to disclose the alibi testimony. In this case, as stated above, defendant did not file his answer to the State's discovery request until 10 days prior to trial. In the answer, defense counsel stated that the defense would question the sufficiency of the evidence only. However, because Felix Davenport was listed as a possible witness, it is clear that this is not a scenario where the attorney failed to investigate his defense. Rather, this situation is more akin to the attorney deliberately choosing not to disclose this defense until the last minute. Thus, this deliberate violation of the discovery rules falls below the standard of reasonableness for professional assistance. Therefore, trial counsel's performance in this instance was deficient. However, as defendant could not testify as to his own whereabouts at the time of the murder and had given an inculpatory statement about his involvement, it cannot be said that this testimony would have rendered a different result.

■ Defendant also claims that counsel was ineffective for failing to present evidence that one of his accomplices was possibly in jail at the time of the crime. Defendant contends that because this information would have discredited his own inculpatory statement, he was prejudiced and should receive a new trial. The State initially argues that because defendant did not attach an affidavit specifying what the testimony would entail, it has been waived.

Where the disposition of a defendant's ineffective assistance of counsel claim requires consideration of matters beyond the record on direct appeal, it is more appropriate that the defendant's contentions be addressed in a proceeding for postconviction relief, and the appellate court may properly decline to adjudicate the defendant's claim in his direct appeal from his criminal conviction. See *People v. Morris*, 229 Ill. App. 3d 144, 167 (1992). Courts allow postconviction petitions

where resolution of the issues requires an inquiry into matters outside the common law record. *People v. Thomas*, 38 Ill. 2d 321, 231 N.E.2d 436 (1967); *People v. Smith*, 268 Ill. App. 3d 574, 578 (1994).

Neither the police officer's identity nor the testimony that the officer would allegedly present was made part of the official report of the proceedings. Therefore, this court cannot consider any attachments to the record, as extrinsic evidence cannot be presented to address an ineffective assistance of counsel claim. See *People v. Morris*, 229 Ill. App. 3d 144, 166 (1992).

Based upon the foregoing analysis, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN and HALL, JJ., concur.