2016 IL App (4th) 150444
NO. 4-15-0444

FILED
April 29, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| DAVEY R. SHAW, JR., | ) | No. 09CF393 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Holder White and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1 Following an October 2012, trial, a jury found defendant, Davey R. Shaw, Jr.,

guilty of possession of a controlled substance (cocaine) (720 ILCS 570/402(c) (West 2008)),

possession of cannabis (720 ILCS 550/4(a) (West 2008)), and resisting or obstructing a peace

officer (720 ILCS 5/31-1(a) (West 2008)). In December 2012, the trial court sentenced

defendant to 5 years' imprisonment for possession of a controlled substance (cocaine), to run

concurrently with a 364-day sentence for resisting or obstructing a peace officer and a 30-day

sentence for possession of cannabis. Defendant appealed, arguing the trial court (1) erred in

refusing to conduct a *Batson* hearing (*Batson v. Kentucky*, 476 U.S. 79, 89 (1986)); (2) erred in

admitting evidence, over objection, and allowing argument that possession of cannabis was a

"fine-only" offense; and (3) violated his constitutional right to be present during sworn

testimony. In November 2014, this court agreed with defendant's first contention and remanded

the case to the trial court for a full *Batson* hearing. *People v. Shaw*, 2014 IL App (4th) 121157, 21 N.E.3d 802. We retained jurisdiction to review the trial court's ruling after remand and to address the remaining issues raised by defendant in his appeal.

¶ 2 On remand, the trial court conducted a full *Batson* hearing. The trial court entered a written order on May 5, 2015, in which it concluded defendant had failed to establish purposeful discrimination by the State during *voir dire*. The case now comes back to us for resolution of the *Batson* issue in light of the proceedings conducted on remand, with defendant asserting the trial court erred by accepting the State's race-neutral explanations for exercising peremptory challenges. Defendant also argues for the first time that the trial court erred when it ordered the balance of defendant's bond to be reimbursed to the public defender's office without having provided defendant with notice or a hearing to determine defendant's ability to pay the public defender fee. In addition, we now consider the remaining issues over which we retained jurisdiction relating to the admissibility of certain evidence and defendant's constitutional right to be present during certain sworn testimony. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 On August 10, 2009, the State charged defendant by information with possession of a controlled substance (cocaine) (720 ILCS 570/402(c) (West 2008)), possession of cannabis (720 ILCS 550/4(a) (West 2008)), and resisting or obstructing a peace officer (720 ILCS 5/31-1(a) (West 2008)).

¶ 5                                    A. *Voir Dire*

¶ 6 Defendant's first jury trial ended in a mistrial. His second jury trial commenced on October 17, 2012.

¶ 7        The jury venire consisted of 28 prospective jurors, whom the trial court divided into two panels of 14 venire members.  No *Batson* issue was raised during consideration of the first panel of 14 prospective jurors.  In the second panel of prospective jurors, the State used peremptory challenges to excuse two African-American venire members and defendant raised respective *Batson* objections.  The record establishes defendant is African-American.

¶ 8        During *voir dire*, the trial court asked the first panel of prospective jurors the following question:  "If after you hear everything,—the evidence, the arguments, and my instructions on the law—you believe that the State has proved its case beyond a reasonable doubt, will you sign a guilty verdict form?"  The following colloquy then occurred:

> "[THE COURT]:  Mrs. O'Kane?
>
> JUROR O'KANE:  Could you repeat that, please.
>
> THE COURT:  Sure.  If after you hearing everything,—the evidence, the arguments, and my instructions on the law—you believe that the State has proved its case beyond a reasonable doubt, will you sign a guilty verdict form?
>
> JUROR O'KANE:  Yes."

The court proceeded to address the other venire members in the first panel by name and all responded affirmatively to the court's question.  The court repeated this question to each venire member in the second panel.  After the first three prospective jurors responded affirmatively, the following colloquy occurred:

> "THE COURT:  Miss Bynum?
>
> JUROR BYNUM:  You said if I believed that the evidence—

THE COURT:  Here is the question.  I'm going to read it to you again; okay?  If after you hear everything,—the evidence, the arguments, and my instruction on the law—you believe that the State has proved its case beyond a reasonable doubt, will you sign a guilty verdict form?  Miss Bynum?

JUROR BYNUM:  Yes."

¶ 9    The trial court also asked prospective jurors to raise their hands if they had "any friends or relatives who [were] State's Attorneys, [d]efense attorneys, members of a police force, or involved in law enforcement?"  After a brief discussion with one prospective juror in the second panel who had raised his hand, the following colloquy ensued:

"THE COURT:  Okay.  Anybody else in the first row?

JUROR HEIDRICK:  Could you repeat that please?

THE COURT:  Do you have any friends or relatives who are State's Attorneys, [d]efense attorneys, members of a police force, or involved in law enforcement?

JUROR HEIDRICK:  I have friends that are on the police force but not the ones you mentioned."

¶ 10   The trial court also asked the jury venire whether they, or a close friend or family member, had been charged with an offense similar to possession of a controlled substance, possession of cannabis, and resisting or obstructing a police officer.  Juror Chamberlain indicated a close friend of hers was recently charged with possession of a controlled substance and that the case was pending.  Juror English stated he had several family members who had been charged with possession of a controlled substance, some of whose cases were pending.  Juror Llama

- 4 -

stated she pleaded guilty to a possession charge in 1998. Juror King indicated her nephew had been charged with possession approximately five years prior. Juror Smith stated her boyfriend was recently charged with possession and his case was pending. All of these prospective jurors stated that they could remain fair and impartial.

¶ 11        In addition, the trial court asked prospective jurors to raise their hands if they knew any of the possible witnesses in the case. The court listed each witness by name and if a prospective juror raised his or her hand, the court inquired further into the relationship. Juror O'Kane, who once held a position on the city council and whose son was a police officer, knew a number of the State's witnesses but stated she could be fair and impartial. Several other jurors also knew some of the identified police officers and the circuit clerk through their respective jobs, but all stated they could be fair and impartial.

¶ 12        Upon being asked whether anyone knew defendant, juror Smith raised her hand and informed the court that "[h]e was a friend of the family." Smith stated she did not know defendant personally, but she was friends with his cousins and nieces. When asked whether her relationship with defendant's family would prevent her from being fair and impartial, Smith responded, "[n]o, Ma'am." Juror Delanois also stated he knew defendant as he "was introduced to him by a personal friend" years before. When asked whether his relationship with defendant would prevent him from being fair and impartial, Delanois responded, "[n]o" and explained, "[a]ll I know is he was a friend of my friend, and that's pretty much it."

¶ 13        Further, the trial court asked prospective jurors to raise their hands if they, or a close friend or family member, had ever been the victim of a crime. Juror Smith stated that her sister's car had been set on fire in 2010, that Smith's boyfriend was arrested for the crime, and that his case was pending due to a probation violation.

¶ 14       Following *voir dire* questioning, the prosecutor asked to excuse juror Smith for cause, stating, "I believe she's friends with the [d]efendant's family, and also her boyfriend has some current cases going on, so I'm not sure.  And also her boyfriend is represented by the Public Defender's Office."  Defense counsel noted Smith said she could be fair and impartial and stated, "[l]ike all the other jurors who have friends and know people, I mean, it's a small town.  I don't think that's a reason to strike her for cause."  The court declined to exclude Smith for cause. Thereafter, the State used peremptory challenges to exclude several jurors, including juror Chamberlain.

¶ 15       The State used its fifth peremptory challenge to exclude juror Bynum, at which point defense counsel raised a *Batson* challenge, arguing that Bynum was the only African-American on the panel so far and that "[t]he prosecutor has used its [*sic*] peremptory challenge to remove that venire member from the jury, and there are no facts or other relevant circumstances that would raise an inference that this was anything other than for race."  The prosecutor responded, in relevant part, that "the Court asked [Bynum] if she could sign a guilty verdict, and she hesitated and had the Court basically re[-]ask the question.  That was one of the reasons."  In addition, the prosecutor informed the court that defendant had to show a pattern of "kicking off jurors with regard to race" under *Batson*.  Thereafter, the court announced that defendant "ha[d] not established a pattern under *Batson*" and excused Bynum from the venire.

¶ 16       The State used its final peremptory challenge to excuse juror Smith, who was being considered as an alternate juror, announcing "[t]he State would use the challenge with regard to Miss Smith as we did before on cause."  Defense counsel raised a *Batson* challenge, asserting that Smith was "the second black person in the venire.  Every single other person has been white.  The State has now exercised peremptories against both blacks, and I would suggest

that we now have a pattern."   The State responded, "if it helps, we'll accept Miss Williams."

The record shows Williams is African-American.  The court excused Smith, noting as follows:

"I don't think a pattern has been shown.  There was an original motion to remove [her] for cause

because of her relationship with [defendant's] family, and I denied the motion for cause.  But I do

not feel that there has been established a pattern with either Miss Bynum or Miss Smith."

Thereafter, juror Williams was accepted by both parties as the alternate.

¶ 17                    B. Admissibility of Certain Evidence at Trial

¶ 18          During his opening statement, defendant conceded that he had possessed cannabis

at the time of his arrest and resisted the police officers, but he denied having possessed cocaine.

¶ 19          The evidence established that defendant was a backseat passenger in a vehicle that

was parked in the Elks parking lot shortly after midnight on August 8, 2008.  The parking lot was

being observed by police officers, who had received information people were parking in the lot

to drink alcohol and smoke cannabis.  Danville police officer Eric Olson testified that he

observed a black male—whom he identified as defendant—exit the vehicle, unroll a cigar, and

reenter the vehicle.  Olson suspected defendant was preparing to roll a cannabis "blunt."  Olson

stated that one minute later, defendant exited the vehicle and "brushed his pants off, which is

normally indicative of brushing tobacco off your legs or the extra—excess marijuana."  Olson

notified Sergeant John Thompson and Officers Joseph Blew and Joshua Webb of his

observations.

¶ 20          Sergeant Thompson testified that he approached the front-passenger door of the

vehicle and spoke with the female passenger sitting in the seat.  He observed open alcohol in the

car and smelled cannabis.  According to Thompson, Officer Webb opened the back door and

asked the backseat passenger, whom he identified as defendant, to step out of the vehicle.

¶ 21 Officer Webb testified that when he asked defendant if he had any "weed" on him, defendant responded, "no." However, Webb stated when he began searching defendant, defendant "pulled away" from him and ran in an easterly direction. Webb and Officer Blew chased defendant and a struggle ensued, after which defendant broke away again and ran. At that time, Webb testified Sergeant Thompson used his Taser on defendant. Webb then wrestled defendant to the ground. According to Webb, defendant pulled his hands underneath his stomach and continued to struggle.

¶ 22 Thompson testified that after defendant was subdued, he asked defendant why he ran and defendant responded that he had some "weed" in his pocket. Thompson seized two Baggies containing cannabis from defendant's right front pants pocket.

¶ 23 Officer Webb stated that after Sergeant Thompson and Officer Blew removed defendant from the area where they had landed with him on the ground and struggled, Webb used his flashlight to illuminate the area "and right where we just landed on top of the ground there, I found a bag of suspected crack cocaine." Webb testified the Baggie was not dirty or dusty, "like it hadn't been sitting there for a week or anything."

¶ 24 Officer Olson testified that as the other officers were securing defendant on the ground, he returned to the vehicle, where he found a blunt containing cannabis and open alcohol. He issued a "city ticket" to the female passenger and testified, "it's a fine-only offense. It doesn't go on your record. You have to go to City Hall, and you pay a small fine for smaller offenses." According to Olson, the possession of "ten grams or under" of cannabis was a "city offense."

¶ 25 During Sergeant Thompson's testimony, the following colloquy occurred:

"[THE STATE]: Okay. And then what happened as far as on the scene after [the Baggie of cocaine was retrieved]?

- 8 -

[THOMPSON]: [Defendant] was transported to the [police station]. The two females were issued notice-to-appears through city ordinance for the drinking and the cannabis.

[THE STATE]: Now, the cannabis and the alcohol, is there a procedure? And tell us why the notice to appear is used.

[THOMPSON]: If it's less than ten grams—

[DEFENSE COUNSEL]: Objection, your Honor, that's not relevant. Objection, relevance.

[THE COURT]: Mr. [Prosecutor].

[THE STATE]: I think it actually is relevant. [Defendant] had cannabis on him, and there would be an argument as to why he ran.

[THE COURT]: Objection is overruled. You may answer the question.

[THOMPSON]: If there's less than ten grams of cannabis found, you can be issued a notice to appear, which is a city ordinance violation. It's a ticket. The fine is anywhere from $75 to $300. It doesn't go against your criminal history. It's just a fine-only offense.

[THE STATE]: So controlled substances or cocaine you don't get a notice to appear, correct?

[THOMPSON]: That's correct."

¶ 26    During Officer Webb's testimony, the following colloquy occurred:

"[THE STATE]: And you said after the cannabis was found you purposely looked in that area to see where you were?

[WEBB]: I wanted to know right where we were so I could make sure I could come right back to it, yes.

[THE STATE]: And what's the procedure after you've had to chase someone? Do you normally do a search?

[WEBB]: Yes.

[THE STATE]: And why is that?

[WEBB]: For several reasons. Number one, it's usually pretty uncommon for somebody to just run away from you for marijuana; and in my experience, because a lot of times I know it's just a small charge, most of the time we just write them a ticket and send them on their way, so we're looking to see if there's another reason: Did they have a gun; did they have other evidence; or did they have anything.

[DEFENSE COUNSEL]: Objection, [Y]our Honor.

[THE COURT]: What's your objection?

[DEFENSE COUNSEL]: The reasons why other people might do things doesn't have a great deal of relevance to this case.

[THE COURT]: Well, the question was what does an officer usually do in a situation like this, and I think he's just explaining what they usually do in a situation like this, so the objection is overruled.

[THE STATE]: Did you finish your answer?

[WEBB]: Well, basically what I'm getting at is we're looking for any other evidence basis in our mind. Kind of just running for marijuana isn't something a lot of people do. I'm not saying nobody would do it, but

normally people don't run away from me for that. And then also the other thing is during that struggle and chasing and things like that sometimes you drop your radio, you drop your flashlight, you drop anything else, so we pretty much just start and backtrack, and that's something I do every single time. I start back where the incident ended, and I backtrack all the way back to the beginning, looking for other equipment or evidence.

[THE STATE]: So this is something you do in every case where someone has r[u]n from you.

[WEBB]: Yes."

¶ 27   Danville police officer Dennis Rogers testified that he was working in the booking area of the Danville public safety building when defendant approached him about the amount of his bond. Rogers stated the amount of bond would depend on the reason for defendant's arrest. According to Rogers, defendant told him he had been arrested because "I had two [B]aggies of weed and a little piece of cocaine on me."

¶ 28   During the State's closing argument, the prosecutor stated as follows:

"They get [defendant] up, search him. 'Why did you run?' Well, because I had this little bag of weed on me. That's why I ran from you at the car, ran over here, ran into a car, damaged it, ran from you again, ran over here past the car, got tackled, still resisting. I ran from you because of this little bag of cannabis, the bag of cannabis similarly the females in the car were found with which got notice-to-appears, didn't get arrested for.

So the [d]efendant says, 'I've got some weed on me.' He admits it. And [Sergeant] Thompson, I believe it was, searched him, found this in

- 11 -

his pocket. Eventually it was sent away to the crime lab. The scientist says, 'Hey, this is cannabis. We know it's cannabis.'

But we're not done there yet. We have to figure out why we're running from the police because it's not because of this cannabis. We have to figure out why we're resisting or obstructing. We've got two crimes so far: possession of cannabis and resisting or obstructing. We have to find out why we're running from the police over and over and over again."

During his rebuttal closing argument, the prosecutor further stated:

"It's a situation where he's further confronted and says, 'Well, do you have any cannabis on you?

No, I don't have any cannabis.' Oh, but I'm going to run over here; I'm going to jump into this car; you're going to catch up to me. I'm going to run over here again. You're going to catch up to me, and I'm going to continue to resist, all because of this cannabis. Oh, wait, you know what? I do have this on me. I do. I forgot. And I'm running just because of this. This is something that doesn't get me arrested. And then when I'm arrested, I'm on the ground shuffling, moving my hands; maybe I've got it out of my pocket. Maybe it was in my hand. Maybe I threw it down. But what I do is I put that cocaine there because I don't want it found on me."

¶ 29    C. Witness Testimony Heard Outside of Defendant's Presence

¶ 30    After the trial court recessed defendant's trial at the end of the first day, the court notified the prosecutor and defense counsel that it was reconvening on the record because a juror

- 12 -

had raised a concern with a bailiff.  Defense counsel was unable to reach defendant by telephone.  With defendant absent from the courtroom, the court heard sworn testimony from the bailiff, Don Dietzen, and a sheriff's deputy, David Harrold.

¶ 31        Dietzen testified that juror Clapp had told him she was concerned about a black male who sat in the back of the courtroom and made constant eye contact with her since the trial began.  Harrold testified that when the trial recessed for the day, he exited the courtroom with a black male and female who had been sitting in the back of the courtroom.  As they exited the courtroom, a white female juror exited the jury room door and the black male said something to the juror along the lines of "excuse me" or "how are you" to the juror, who Harrold noticed had a "concerned look on her face."  Harrold further testified when defendant exited the courtroom, he and the black male left together.

¶ 32        Defense counsel moved for a mistrial.  The trial court reserved ruling on counsel's motion for a mistrial and stated that it would revisit the matter in the morning, when the juror was available to be questioned.  The next morning, the trial court informed defendant of the proceedings conducted outside of his presence the night before, noting it "put all of this on the record last night with Mr. Dietzen present, Deputy Davey Harrold was present, and both attorneys."  The court then questioned juror Clapp in the presence of defendant, defense counsel, and the prosecutor.  Clapp stated she told Dietzen there was someone sitting in the courtroom who kept making eye contact with her and made her feel "a little intimidated."  She acknowledged having seen the same man in the hallway of the courthouse when she left the jury room the night before, but she said he did not say anything to her or make eye contact at that time.  She further stated she had not discussed the information with anyone other than Dietzen and assured the court that she could remain impartial.

- 13 -

¶ 33                          D. The Verdict and Posttrial Proceedings

¶ 34        At the close of evidence, the jury found defendant guilty of all three charges.

Defendant filed a motion for a new trial, which the trial court denied.  On December 17, 2012,

the trial court sentenced defendant to 5 years' imprisonment for possession of a controlled

substance (cocaine) to be served concurrently with a 30 day-sentence for unlawful possession of

cannabis and a 364-day sentence for resisting or obstructing a peace officer.  In addition, the

court assessed court costs but declined at that time to address the State's motion for payment of

court-appointed counsel.

¶ 35        On December 19, 2012, defendant filed his notice of appeal.  At a February 7,

2013, hearing, the trial court took judicial notice of an affidavit filed by the public defender's

office regarding the time spent on defendant's case and ordered that the "bond money after

payment of court costs in this case—that the balance be tendered to the Public Defender for

attorney's fees."  Thereafter, the circuit clerk recorded the public-defender fee as $290.  On

March 3, 2013, this court allowed defendant to supplement the record, in relevant part, with a

computer printout listing the assessment of a number of fines and fees, including a $290 public-

defender fee.

¶ 36        As indicated, in November 2014, this court remanded the case to the trial court

with directions to conduct a full *Batson* hearing.  We retained jurisdiction to review the trial

court's ruling after remand and to address the remaining issues raised by defendant in his appeal.

¶ 37        On remand, the trial court found defendant had established a *prima facie* case of

discrimination.  During the second stage of the *Batson* hearing, the State articulated its race-

neutral explanations for challenging the jurors.  Regarding Bynum, the State recalled that she

hesitated when asked whether she could find defendant guilty if the evidence supported such a

- 14 -

finding, requiring the court to repeat the question. Specifically, the State stated that "when the question came up could you find the [d]efendant guilty[,] there was a juror that there was a long pause, there was a look, the Court actually had to repeat the question and that's in the transcript." The State further argued as follows:

> "Now none of those things as far as the hesitation, the pause, things like that are gonna show up in a transcript, no fault of the court reporter, they just don't show up, that's why we have to—to think about our memory and what happened. I specifically remember it happening as we were on the third floor of this courthouse back a couple years ago. So that's the specific reason I gave at that point and nothing has changed."

Regarding Smith, the State recalled it had initially sought to remove her for cause because she was friends with defendant's cousins and nieces. In addition, the State noted Smith's boyfriend had pending cases and was represented by the public defender's office.

¶ 38 Defense counsel argued that, like Bynum, juror O'Kane, whom the State accepted, "had a similar problem" with the court's question regarding whether she could sign a guilty verdict and asked the court to repeat the question. Counsel further argued that although Smith— who knew some of defendant's family—stated she could be fair and impartial, she was excused, while O'Kane—who knew most of the State's witnesses—was accepted by the State.

¶ 39 After taking the matter under advisement, the trial court issued a written order in May 2015. The court accepted the State's race-neutral explanations and concluded defendant had failed to establish purposeful discrimination. Specifically, the court found as follows:

"The Court has determined that [d]efendant has not shown purposeful discrimination. The Court finds that the [p]rosecutor was credible and that the [p]rosecutor's demeanor did not show discriminatory intent, but merely showed strategic decisions. Furthermore, the Court finds that both Jurors Bynum's and Smith's demeanor can be credibly said to have exhibited the basis for the strike attributable to the jury by the [p]rosecutor."

¶ 40    Thereafter, the parties filed supplemental briefs with this court and the matter is once again before us for review.

¶ 41                              II. ANALYSIS

¶ 42    In his supplemental brief, defendant asserts the trial court erred by accepting the State's race-neutral explanations during the third stage of the *Batson* hearing on remand. Defendant also argues for the first time that the trial court erred when it ordered the balance of defendant's bond to be reimbursed to the public defender's office because it failed to provide defendant with notice or conduct a hearing to determine defendant's ability to pay the public-defender fee in violation of section 113-3.1(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/113-3.1(a) (West 2012)). In addition, we now consider the remaining issues over which we retained jurisdiction, including whether the trial court erred in admitting evidence, over objection, and allowing argument that possession of cannabis was a "fine-only" offense, and whether defendant's constitutional right to be present during sworn testimony was violated.

¶ 43                          A. *Batson* Hearing

¶ 44    Defendant asserts the trial court erred by accepting the State's race-neutral explanations for striking Bynum and Smith at the third stage of the *Batson* hearing on remand. According to defendant, the State's explanations were implausible and pretextual.

- 16 -

¶ 45    As discussed in our original opinion, *Batson* held "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89.  At the third stage of the *Batson* hearing, "the trial court must determine whether the defendant has shown purposeful discrimination in light of the parties' submissions." *People v. Davis*, 231 Ill. 2d 349, 363, 899 N.E.2d 238, 247 (2008).  In doing so, the court "must evaluate not only whether the prosecutor's demeanor belies discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id*. at 364, 899 N.E.2d at 247.

¶ 46    "Generally, a trial court's ultimate conclusion on a *Batson* claim will not be overturned unless it is clearly erroneous; this deferential standard is appropriate because of the trial court's pivotal role in the evaluation process." *Id*.  "A finding is clearly erroneous where the entire record leaves the reviewing court with the definite and firm conviction that a mistake has been made." *Fleming v. Moswin*, 2012 IL App (1st) 103475-B, ¶ 36, 976 N.E.2d 447.

¶ 47    As indicated, on remand, the trial court specifically found that defendant failed to show purposeful discrimination.  The court explicitly noted "the [p]rosecutor was credible and that the [p]rosecutor's demeanor did not show discriminatory intent, but merely showed strategic decisions."  In addition, the court found "both Jurors Bynum's and Smith's demeanor can credibly be said to have exhibited the basis for the strike attributable to the jury by the [p]rosecutor."  Based on our examination of the record of the original *voir dire* proceedings, as well as the hearing on remand, we cannot find the court's determination on this matter was clearly erroneous.

¶ 48        While defendant acknowledges the State's claim that Bynum hesitated and "had a facial expression that was not recorded in the transcript," he asserts, "[e]ven if there was a pause or suspect facial expression, it [was] not enough to overcome the court's finding of a *prima facie* case of discrimination." We disagree. The threshold for establishing a *prima facie* case of unlawful discrimination is not high and is satisfied by simply " 'producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' " *Davis*, 231 Ill. 2d at 360, 899 N.E.2d at 245 (quoting *Johnson v. California*, 545 U.S. 162, 170 (2005)). At the third stage of a *Batson* hearing, however, the trial court takes into consideration the demeanor of both the prosecutor and the juror to determine whether the defendant has shown purposeful discrimination based on the parties' submissions. *Id*. at 364, 899 N.E.2d at 247.

¶ 49        Defendant cites *Miller-El v. Dretke,* 545 U.S. 231, 241 (2005), for the proposition, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." The Court used a comparative-juror analysis to determine that the State's explanations for striking African-American jurors were pretextual. *Id*. at 247. In one instance, the Court found it significant that

> "nonblack jurors whose remarks on rehabilitation could well have
> signaled a limit on their willingness to impose a death sentence
> were not questioned further and drew no objection, but the
> prosecution expressed apprehension about a black juror's belief in
> the possibility of reformation even though he repeatedly stated his
> approval of the death penalty and testified that he could impose it
> according to state legal standards even when the alternative

- 18 -

sentence of life imprisonment would give a defendant (like

everyone else in the world) the opportunity to reform." *Id*. at 245.

In another instance, the court noted the State's proffered reason for excusing a second African-American juror, *i.e.*, the juror gave inconsistent responses regarding his thoughts on the death penalty, was pretextual where other nonblack panel members expressed similar views. *Id*. at 248-49.

¶ 50        Defendant argues that a comparative-juror analysis reveals the State's proffered reason for striking Bynum was pretextual. Specifically, he asserts that the State accepted jurors O'Kane and Heidrick—both of whom he maintains hesitated and asked the trial court to repeat a question during *voir dire*—as jurors. The State in this case noted its reason for striking Bynum was due to her "long pause" and the "look" she gave upon being asked whether she could sign a guilty verdict. However, the record contains no indication that either O'Kane or Heidrick hesitated at all prior to responding to the trial court's question, or any indication of their facial expressions. Thus, defendant's comparative-juror argument as to Bynum fails.

¶ 51        Defendant also argues the State's explanations for striking juror Smith, including her personal relationships with defendant's cousins and nieces, were pretextual. In support, defendant points out that the State accepted juror Delanois, a white man who knew defendant. We note, however, that Delanois's knowledge of defendant derived from a single instance where a friend had introduced the two individuals years before. On the other hand, Smith was personal friends with several of defendant's family members. The State also pointed out that Smith's boyfriend had a pending criminal matter as an additional basis for its challenge. Defendant counters that a number of other jurors had personally been convicted of an offense, or had family members who had, which is evidence that the State's proffered race-neutral explanation

- 19 -

regarding Smith's boyfriend's charge was pretextual. Unlike the other jurors' situations, Smith's boyfriend had cases pending at the time of *voir dire* and he was represented by the public defender's office. We note the ongoing criminal proceedings against Smith's boyfriend arguably weighed more on Smith than did the past criminal proceedings for the other jurors. We also note that the State exercised peremptory challenges on jurors Chamberlain and English, white prospective jurors who, like Smith, had close friends or family members who had recently been charged with possession of a controlled substance and whose cases, like Smith's boyfriend's cases, were pending. Thus, defendant's comparative-juror analysis as to Smith also fails.

¶ 52        Based on the above, we cannot say the trial court's finding that defendant failed to show purposeful discrimination during *voir dire* was clearly erroneous.

¶ 53                            B. Public Defender Fee

¶ 54        Defendant also argues for the first time that the trial court erred when it ordered the balance of defendant's bond to be reimbursed to the public defender's office because it failed to provide defendant with notice or conduct a hearing to determine defendant's ability to pay the public defender fee in violation of section 113-3.1(a) of the Code (725 ILCS 5/113-3.1(a) (West 2012)). The State concedes this issue and asserts the appropriate remedy is to vacate the public-defender fee and remand for a hearing in conformity with the Code.

¶ 55        Before we can address the merits of this issue, we must first address a potential jurisdictional defect. Although neither party has addressed our jurisdiction to consider the issue, a reviewing court has an independent duty to ascertain its jurisdiction. *People v. Smith*, 228 Ill. 2d 95, 104, 885 N.E.2d 1053, 1058 (2008).

¶ 56        As indicated, defendant filed his notice of appeal on December 19, 2012. The notice indicated he was appealing the December 17, 2012, judgment. Obviously, the notice did

not include any indication that defendant was asserting error with the public defender fee as it was not assessed until February 7, 2013. Thus, the threshold question is whether defendant's notice of appeal effectively conferred jurisdiction on this court to consider the trial court's later imposition of the public defender fee. *Id*. We find that it did not.

¶ 57 While we acknowledge the imposition of the public defender fee in this case was a collateral proceeding that occurred after final judgment, defendant did not file an amended notice of appeal in this court to include the public defender fee issue. "Illinois courts have held that a notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts thereof specified in the notice of appeal." *Id.* " '[N]otice[s of appeal] should be considered as a whole and will be deemed sufficient to confer jurisdiction on an appellate court when [they] fairly and adequately set[] out the judgment complained of and the relief sought, thus advising the successful litigant of the nature of the appeal.' " *Id*. at 105, 885 N.E.2d at 1058-59 (quoting *Lang v. Consumers Insurance Service, Inc.*, 222 Ill. App. 3d 226, 229, 583 N.E.2d 1147, 1148 (1991)). While we recognize that notices of appeal are to be construed liberally (see *id*. at 104, 885 N.E.2d at 1058), defendant's notice of appeal in this case did not fairly and adequately set out the trial court's public defender fee assessment and the relief sought. Accordingly, we do not have jurisdiction to consider the propriety of the public defender fee on appeal. *Cf. People v. Jake*, 2011 IL App (4th) 090779, ¶ 24, 960 N.E.2d 45 (no jurisdiction to consider merits of the defendant's argument where circuit clerk assessed late and collection fees six months after sentencing judgment and four months after defendant filed his appeal).

¶ 58         C. Propriety of Certain Evidence and Arguments
Concerning the Possession of Cannabis

¶ 59 Defendant next asserts that "[t]he trial court committed prejudicial error in admitting evidence, over defense counsel's objections, that possession of cannabis was a 'fine-

only' offense, and that [he] would not have run from or resisted the police unless he possessed cocaine." In addition, defendant argues the prejudicial effect of the court's error in admitting this evidence was compounded by the State's emphasis on the evidence during its closing argument. As the admission of evidence and the propriety of closing arguments by the State are two different issues, we address them separately.

¶ 60                                    1. *Admission of Evidence*

¶ 61          "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010). "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court [citations]." *Id.*

¶ 62          Defendant asserts that neither Sergeant Thompson nor Officer Webb was qualified as an expert witness and, therefore, their opinion testimony "about whether suspects generally run from police when they are guilty of 'fine-only' offenses" violated Illinois Rule of Evidence 701 (eff. Jan. 1, 2011). See *id.* (limiting a lay witness's testimony to "opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702").

¶ 63          Initially, we note that the objections advanced by defense counsel at trial were based on relevance rather than improper lay opinion testimony. Thus, we limit our review of the issue to defendant's argument related to relevance. See *People v. Cuadrado*, 214 Ill. 2d 79, 89, 824 N.E.2d 214, 220 (2005) ("a specific objection waives all other unspecified grounds"). "Evidence is relevant when it (1) renders a matter of consequence more or less probable or (2)

tends to prove a fact in controversy." *People v. Pelo*, 404 Ill. App. 3d 839, 864, 942 N.E.2d 463, 485 (2010). "[R]elevant evidence is inadmissible only if the prejudicial effect of admitting that evidence *substantially outweighs* any probative value." (Emphasis in original.) *Id*. at 867, 942 N.E.2d at 487.

¶ 64    Here, defendant takes issue with Officer Webb's testimony that "it's usually pretty uncommon for somebody to just run away from you for marijuana." Our review of the record reveals that Webb made this statement in the context of explaining the reasons he conducts a search of the area after chasing a suspect. In addition to looking for additional evidence which a suspect may have dropped, Webb explained that he also looks for equipment which he may have dropped during the chase or struggle. Thus, taken in the appropriate context, this evidence was relevant to explaining why Webb searched the area where he recovered the Baggie of cocaine and the trial court did not err by allowing it.

¶ 65    Defendant also takes issue with certain testimony of Sergeant Thompson. We note that in his brief, defendant mischaracterizes Thompson's testimony. Contrary to defendant's contention, Thompson did not testify that suspects generally do not run from officers for fine-only offenses. Rather, the record shows that Sergeant Thompson testified: "[t]he two females [in the vehicle] were issued notice-to-appears for city ordinance [violations] for the drinking and cannabis"; that notices to appear are issued for the possession of less than 10 grams of cannabis, which is a "fine-only offense"; and that notices to appear are not used for the possession of a controlled substance. Despite defendant's mischaracterization of the evidence, we agree that the above testimony by Thompson was irrelevant as it did not render a matter of consequence in defendant's case more or less probable or prove a fact in controversy. Nonetheless, we find the trial court's admission of this evidence to be harmless error.

¶ 66　　　　　"An evidentiary issue is harmless when no reasonable probability exists that the jury would have acquitted the defendant absent the error." *Id.* at 865, 942 N.E.2d at 486. Here, the evidence of defendant's possession of cocaine was overwhelming. During the struggle with police officers, defendant pulled his hands underneath his stomach. Immediately after defendant was removed from the area, Officer Webb shone his flashlight on the ground where defendant had been lying and found a Baggie of crack cocaine, which was not dirty or dusty, lying directly on top of the ground. Further, while in the booking area of the public safety building, defendant informed an officer he had been arrested because he "had two [B]aggies of weed and a little piece of cocaine on [him]." In light of the above, we find that no reasonable jury would have acquitted defendant absent Thompson's erroneous testimony.

¶ 67　　　　　　　　　2. *The State's Closing and Rebuttal Arguments*

¶ 68　　　　　Defendant also argues that the State's closing and rebuttal arguments were improper and prejudicial. Specifically, he argues the State erred when it "emphasized that [defendant] would not have run from the police or resisted them based solely on this possession of cannabis, which 'doesn't get me arrested.' " Defendant concedes the alleged error was not preserved for appeal (see *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988) (to preserve an error for appellate review, a defendant must raise the issue at trial and in a posttrial motion)); however, he contends this court may review the issue for plain error.

¶ 69　　　　　"The plain-error doctrine permits a reviewing court to by-pass normal rules of forfeiture and consider '[p]lain errors or defects affecting substantial rights *** although they were not brought to the attention of the trial court.' " *People v. Eppinger*, 2013 IL 114121, ¶ 18, 984 N.E.2d 475 (quoting Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)). "Plain-error review is appropriate under either of two circumstances: (1) when 'a clear or obvious error occurred and

the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error'; or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id.* (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007)). "A defendant seeking plain-error review has the burden of persuasion to show the underlying forfeiture should be excused." *People v. Johnson*, 238 Ill. 2d 478, 485, 939 N.E.2d 475, 480 (2010). Although the first step of plain-error analysis is generally to determine whether any error occurred, this step is merely a " 'matter of convention,' " and "[w]hen, as here, the record clearly shows that plain error did not occur, we will reject it without further analysis." *People v. Bowens*, 407 Ill. App. 3d 1094, 1108, 943 N.E.2d 1249, 1265 (2011) (quoting *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1059 (2010)).

¶ 70        "A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204, 917 N.E.2d 401, 419 (2009). Further, "even improper remarks [by a prosecutor] do not merit reversal unless they result in substantial prejudice to the defendant." *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57, 964 N.E.2d 87. "A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context." *Glasper*, 234 Ill. 2d at 204, 917 N.E.2d at 420.

¶ 71        We have already concluded that the evidence of defendant's possession of cocaine in this case was overwhelming, and therefore, defendant cannot satisfy the first prong of the plain-error analysis as the evidence was not closely balanced. Thus, our review is limited to the second prong of the plain-error analysis.

¶ 72        Our supreme court has compared the second prong of plain-error review to a structural error and has concluded that " 'automatic reversal is only required where an error is deemed "structural," *i.e.*, a systemic error which serves to "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." ' " *People v. Thompson*, 238 Ill. 2d 598, 613-14, 939 N.E.2d 403, 413 (2010) (quoting *Glasper*, 234 Ill. 2d at 197-98, 917 N.E.2d at 416 (2009), quoting *People v. Herron*, 215 Ill. 2d 167, 186, 830 N.E.2d 467, 479 (2005)). Structural errors "include a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction." *Id*. at 609, 939 N.E.2d at 411.  The State's closing and rebuttal arguments here do not fit within the limited class of cases where structural error has been found, nor did the arguments affect the fairness of defendant's trial or challenge the integrity of the judicial process.  See *People v. Adams*, 2012 IL 111168, ¶ 24 , 962 N.E.2d 410 (although the prosecutor's comments were improper and the court cautioned they should be avoided in the future, the comments did not amount to plain error under the second prong).  Further, we note that the impact of the prosecutor's comments in this case were minimized by the trial court's instruction to the jury that "[n]either opening statements or closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."  Accordingly, we find the prosecutor's comments, even if improper, were not so serious that they affected the fairness of defendant's trial or challenged the integrity of the judicial process.

¶ 73        D. Defendant's Absence From the Sworn Testimony of a Sheriff's Deputy

¶ 74        Last, defendant argues the trial court violated his constitutional right to be present when it heard sworn testimony from Deputy Harrold outside defendant's presence, which

implicated his constitutional right to confront witnesses and compromised his constitutional right to an impartial jury. Again, defendant concedes that this alleged error was not preserved for appeal, but he asserts this court may review the issue for plain error. On this issue, we will first determine whether any error occurred. *Eppinger*, 2013 IL 114121, ¶ 19, 984 N.E.2d 475. If error occurred, we will then "consider whether either of the two prongs of the plain-error doctrine have been satisfied." *Sargent*, 239 Ill. 2d at 189-90, 940 N.E.2d at 1059.

¶ 75        The United States Constitution provides criminal defendants with the general right to be present at their trials pursuant to the due process clause of the fourteenth amendment. *People v. Bean*, 137 Ill. 2d 65, 82, 560 N.E.2d 258, 266 (1990). However, "the Federal right of presence is not an absolute, inviolable right; instead, its scope is contained within the scope of due process." *Id*. "[A]s long as a defendant's absence from a portion of his trial does not deprive him of due process, there is no violation of a defendant's derivative due process right of presence under the United States Constitution." *Id*. at 83, 560 N.E.2d at 266. "[T]he due process right of presence is violated only when a defendant's absence results in his being denied a fair and just trial." *Id*. "If it does not appear that an unfair trial resulted [from the defendant's absence], the defendant's constitutional rights were not violated ***." *Id*. at 83, 560 N.E.2d at 266.

¶ 76        In this case, defendant's argument that his due process right of presence was violated is based on his contention that his underlying sixth amendment rights to confrontation and an impartial jury were violated when Deputy Harrold testified outside his presence. In particular, he asserts that "when compared with the trial court's questioning of juror Clapp in [defendant's] presence the following day, the testimony of Harrold raises the possibility that there was a separate incident involving contact with a separate juror outside the courtroom." Thus, he argues he was deprived of the opportunity to suggest (1) additional questioning of

Harrold to determine whether the incident Harrold observed involved a juror other than Clapp; (2) additional questioning of Clapp to determine if she was aware of an incident involving a second juror; and (3) the court question other jurors "to find out whether any other juror had been contacted and, if so, the effect on such jurors' impartiality."

¶ 77    First, we note that Deputy Harrold was not a witness against defendant in this case. Rather, Harrold was a court employee who testified only that he had observed a black male who had been sitting in the courtroom say something like "excuse me" or "how are you" to a white juror who had just exited the jury room and that the juror had a "concerned look" on her face. Thus, defendant's absence during Harrold's questioning did not violate his sixth amendment right to confront witnesses against him.

¶ 78    Defendant argues that had he been present for Deputy Harrold's testimony, he could have suggested "that the trial court or defense counsel question the other jurors based on Harrold's testimony, to find out whether any other juror had been contacted and, if so, the effect on such juror's impartiality."

¶ 79    Notably, no other juror expressed any concerns to the court regarding the incident about which Harrold testified. Defendant cites no authority which would support the trial court undertaking such an effort to determine if any of the jurors had been approached by a black male who said "excuse me" or "how are you" after court recessed on the first day. See *People v. Burns*, 304 Ill. App. 3d 1, 7, 709 N.E.2d 672, 677 (1999) (finding "no basis in the record for disregarding the trial court's decision on whether to risk tainting the jury by reopening *voir dire* on the mere speculation that the juror might have had a conversation with the [decedent's] family"). While defendant has a constitutional right to an impartial jury, we decline to find that an innocuous "excuse me" or "how are you" in the hallway of the courthouse would have had a

- 28 -

prejudicial affect on a juror such that the juror could not remain impartial.  See *Johnson*, 238 Ill. 2d at 489, 939 N.E.2d at 482 ("a nonprejudicial *ex parte* communication is insufficient to impact the fairness of a defendant's trial").

¶ 80        Based on the above, we find that defendant's absence from the proceedings in which Deputy Harrold's sworn testimony was taken did not render his trial unfair.  Accordingly, his constitutional right to be present was not violated.  As we find no error occurred, we need not proceed further in our plain-error analysis.

¶ 81                                III. CONCLUSION

¶ 82        For the reasons stated, we affirm the trial court's judgment.   As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

¶ 83        Affirmed.