NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220074-U

NO. 4-22-0074

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 8, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| WILLIAM RAYMOND CARTER, | ) | No. 20CF1385 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Steigmann and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court held that the evidence was sufficient to convict defendant of criminal sexual assault. The appellate court further held that comments made during the State's opening statement and closing argument, which defendant claimed improperly bolstered the victim's credibility and diluted the reasonable doubt standard, did not amount to plain error.

¶ 2    Following a jury trial, defendant, William Raymond Carter, was found guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2018)) (count I), attempted residential arson (720 ILCS 5/20-1(b), 8-4 (West 2018)) (count III), unlawful restraint (720 ILCS 5/10-3 (West 2018)) (count IV), and two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2018)) (counts V and VI). Defendant was sentenced to 8 years' imprisonment for criminal sexual assault, a consecutive term of 3 years for attempted residential arson, and a concurrent term of 1 year for unlawful restraint, for a total of 11 years' imprisonment. Defendant also received a fine for his domestic battery conviction. Defendant appeals, arguing that the State

presented insufficient evidence of criminal sexual assault, improperly vouched for the credibility of the victim, K.N., during its opening statement, and diluted the reasonable doubt standard during closing argument. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4          In December 2020, defendant was charged with one count of residential burglary (720 ILCS 5/19-3(a) (West 2018) and one count of arson (720 ILCS 5/20-1(a)(1) (West 2018)) (the arson count was ultimately dismissed by the State) in addition to the aforementioned offenses. The charges all stemmed from defendant's alleged acts in September 2020 of beating K.N., forcing K.N. to have sex with him, and setting fires inside her residence.

¶ 5          Defendant's jury trial began in September 2021. The State's theory was that, in early September 2020, K.N. picked up defendant, with whom she was in an off-and-on relationship, from Wisconsin and brought him to her home in Bloomington. According to the State, defendant began to beat K.N. after she attempted to throw his PlayStation out of the front door during an argument. Defendant then prohibited K.N. from leaving her bedroom for a day, during which time defendant forced K.N. to have sex with him. The next day, while defendant was showering, K.N. left the house with her children. While K.N. was gone, defendant set several fires inside K.N.'s home, turned on the burners on the kitchen stove, and left to return to Wisconsin.

¶ 6          Defendant's theory at trial was that K.N. was lying and that he did not commit the alleged acts. According to defendant, K.N. sustained injuries when she fell while trying to throw defendant's PlayStation out of the front door. K.N. then left the house with her children about an hour and a half later. Defendant maintained that he did not force K.N. to have sex with him. Defendant also maintained that a small fire started because his dog knocked over a gas can so

- 2 -

that gasoline splashed onto the couch, which ignited after the smoldering end of a marijuana cigarette fell onto the couch.

¶ 7 During the State's opening statement, the prosecutor noted that K.N. "is standing here in the back of the courtroom. She is the victim in this case, and she will probably be present throughout most of the trial exercising her right to be here in a search for justice." Defendant's counsel did not object. The prosecutor also explained that the evidence would show that K.N. reported the injuries she sustained during the beating to a nurse. The prosecutor stated:

"[W]hen you listen to [K.N.] tell you what happened and you look at the diagrams of the nurse and what injuries she documented on these diagrams, that's how she got those scratches. That's how she got that bruise. [K.N.]'s version of events here is the credible version of events. And I have a feeling that you may hear some evidence otherwise, because she did lie to police officers initially. She was not always forthcoming with police officers, because her children were home when this happened, and she was scared out of her mind that if [the Department of Children and Family Services (DCFS)] were called, they would take her children. She knows now that that was a mistake, that she got herself in more trouble than if she had just been honest the first time. And she will be honest with you when she takes the stand and testifies in this case. She will tell you what happened. She will admit her lies. She will admit her mistakes."

Defendant's counsel did not object.

¶ 8 During the State's case in chief, K.N. testified that she and defendant had been in a volatile, off-and-on relationship since they met in May 2017. They had two children together. In February 2020, K.N. and defendant began renting a house in Bloomington, where they lived

until August 2, 2020. On August 2, 2020, defendant choked her, and while K.N. was in the hospital, defendant packed his belongings, took their dog and K.N.'s phone, and moved to Wisconsin.

¶ 9    K.N. testified that she and defendant continued texting and video chatting over the next month because they "wanted to work things out." Because defendant had taken K.N.'s phone, she used her grandmother's cell phone. At the beginning of September 2020, defendant expressed to K.N. that he wanted to move back to Bloomington. K.N. agreed to pick up defendant and bring him back, but she did not allow defendant to move back in with her.

¶ 10    K.N. drove to Wisconsin and picked up defendant and his things, but she could not recall on which date this occurred. K.N. initially thought she picked defendant up on September 6, 2020; then she believed she did so on September 5, 2020. In any event, K.N. and defendant returned to Bloomington at 5 or 6 p.m. K.N. allowed defendant to remain at the house to see their children. Because defendant could not get ahold of his mother, with whom he was planning on staying, K.N. allowed defendant to sleep on the couch that night while she slept in the upstairs bedroom.

¶ 11    K.N. testified that she awoke at 4:30 a.m. on September 6 to find defendant on top of her with his hands around her neck. Defendant had taken K.N.'s cell phone while she was sleeping and found text messages between her and Mario Casas, a man K.N. had been "seeing." Defendant asked K.N. questions about her relationship with Casas, and K.N. answered truthfully because defendant would strangle her if he suspected she was lying. Eventually, defendant went back downstairs. After a few minutes, K.N. went downstairs to see what defendant was doing, and she found defendant moving his belongings from K.N.'s car into the house. K.N. grabbed defendant's PlayStation to toss it out the door because she did not want defendant to move in, but

defendant "body slammed" K.N. to the floor. Defendant then stomped on K.N.'s knee. K.N. crawled between two couches to avoid defendant, but defendant punched her on the top of her head several times. Defendant told K.N. to go to her bedroom upstairs, and K.N. crawled there because she could not stand on her injured leg. Defendant told K.N. not to leave the room or he would come back up, then defendant went back downstairs. K.N. testified that every time she moved or stood up to reposition her leg, defendant ran up the stairs and yelled at her to stay put. K.N. did not feel free to leave.

¶ 12    K.N. testified that eventually she had to urinate, so she got up and went to the bathroom. Defendant came upstairs and watched K.N. urinate. K.N. explained that, afterwards, defendant prevented K.N. from putting on her pants and directed her back into the bedroom. K.N. testified that defendant made K.N. get on the bed on her knees. Defendant then pushed K.N.'s head against the mattress with one hand and held her hands down with his other hand. K.N. testified that she knew defendant "wanted to have sex," and she "asked him not to do what he was about to do." K.N. explained that defendant placed his penis in her vagina. K.N. was crying and asked defendant to stop, but defendant continued for 5 to 10 minutes. K.N. testified that defendant ejaculated, then he went downstairs to play a video game.

¶ 13    According to K.N., the children woke up around 7:30 a.m., so K.N. brought them into her bedroom to watch TV and keep them calm. K.N. testified, "This was September 6th. We stayed in that room throughout that entire day, until the next day." During that time, defendant brought K.N. and the children food, ice cream, and juice, but he otherwise played a video game downstairs. K.N. did not have a phone with her because defendant had taken her phone. When counsel asked, "Did you have a computer or anything?" K.N. responded that she "had a computer that he had broken in half, and then we had our children's tablets." K.N. testified that

she was not able to contact anyone, because she did not have any electronics upstairs. Eventually, K.N. and the children went to sleep.

¶ 14　　　　K.N. explained that the next morning, September 7, she found her phone and car keys above the kitchen cabinet while defendant showered. K.N. texted her grandmother for help, then drove to her grandparents' house with her children.

¶ 15　　　　K.N. testified that, at about 5 p.m., defendant texted her that he left to go back to Wisconsin. K.N. and her grandfather decided to go back to her house. Before they left, K.N. noticed that she had a bloodstain on her jeans. K.N. testified that she was not experiencing her menstrual period and had not had any vaginal bleeding prior to the assault. K.N. testified, "Since I was 15 my period has come on the exact same date and time, the 14th through the 19th of every month."

¶ 16　　　　K.N. called the police on the way to her house. When K.N. and her grandfather arrived, the police were not there yet. K.N. went inside, noticed the smell of natural gas, and saw that all four stove burners were on high, so she went back outside. Eventually, the police and fire department arrived at K.N.'s home. Officer Benjamin Smith of the Bloomington Police Department observed the home with K.N. K.N.'s television and the children's tablets were missing. K.N. also testified that her "brand new" laptop was broken in half and that defendant had broken it "some point after I had left." All the smoke detectors in the house were on the floor, and their batteries had been removed. A lawnmower and gas cans were in the house even though neither were usually kept inside.

¶ 17　　　　Andrew Coe, a fire investigator who observed K.N.'s house on September 7, 2020, testified that he saw all the smoke detectors on the floor with their batteries removed. Coe noticed a lawn mower and gas cans in the house with their caps removed. A gas detection device

revealed that there was a "relatively high concentration" of natural gas in the air. Coe observed several items in different parts of the house that had sustained fire damage, including a couch with a burned armrest, melted blinds behind the couch, and burns on the floor. Coe testified that the amount of damage he observed was inconsistent with someone dropping a cigarette onto a couch cushion. In Coe's opinion, the fire had several points of origin and was "incendiary in nature," as the only ignition source that could not be ruled out was exposure to open flame such as by a match, candle, or lighter. There was an irregular burn pattern on the carpeting, which indicated that a liquid accelerant was used. Coe clarified that the fire had been extinguished prior to the arrival of the fire department. There was a garden hose in the kitchen, the floors were damp, and the couch was wet to the touch.

¶ 18        Officer Smith testified that he spoke with K.N., during which time defendant called K.N. Smith answered the phone and asked defendant if he started a fire or hurt K.N. Defendant denied that he had done either. Smith also testified that he noticed blood around the zipper on the front of K.N.'s pants and that she had a slight limp. Smith told K.N. that it was in her best interest "to get a rape kit done," so K.N. went to the hospital to undergo an examination.

¶ 19        Ethelinde Bausley, a registered nurse and sexual assault nurse examiner, testified that she examined K.N. on September 7, 2020. Bausley prepared forensic documentation that included K.N.'s statement of what happened. K.N. told Bausley that defendant penetrated her vagina with his penis while holding her down. K.N. also told Bausley that, following the incident, she had used the restroom, used wipes to wash, showered, changed her clothes, and removed an already inserted tampon. K.N. reported that she was experiencing her menstrual period "assuming probably now" and that she had had no sexual contact within three days other than the assault. Bausley conducted a physical examination of K.N. Bausley observed that K.N.

had a "red area" on the back of her neck, a red abrasion on her tongue, bruising on her right shoulder, arm, and shin, and mild swelling on her left knee. K.N. also complained of pain on her head where defendant punched her. Bausley noticed a "notch" or dip in K.N.'s hymen that could have been an indicator of physical trauma. Bausley observed that K.N. had blood on her labia and cervix. During cross-examination, Bausley acknowledged that "notches" in the hymen can be caused by events like childbirth. Bausley also acknowledged that blood on K.N.'s labia and cervix could be consistent with K.N. being on her menstrual cycle.

¶ 20   K.N. testified that, after the hospital visit, an officer took her to the police department. K.N.'s injuries were photographed, then K.N. spoke with a detective about the events. K.N. admitted that when she spoke with the detective, she lied "about [the] children being at the house during some of it" and "about picking [defendant] up from Wisconsin." K.N. testified that she lied because a DCFS investigator had previously told her that "they would take [her] kids" if the police became involved in any part of defendant and K.N.'s relationship again. K.N. feared that if DCFS learned that she "was the one that went up and got [defendant]" from Wisconsin with her children, DCFS "would for sure take [her] kids."

¶ 21   In cross-examining K.N., defendant's counsel challenged K.N.'s claim that she picked up defendant from Wisconsin on September 5, 2020. Location data extracted from K.N.'s phone purportedly showed the phone in Wisconsin on September 1, 2020. (Notably, the record does not contain the location data portion of the data extraction report.) Counsel asked whether, if the location data extracted from K.N.'s phone showed "you in Wisconsin on September 1, 2020, that means you would have picked up [defendant] on that day." K.N. agreed, but she nevertheless denied that defendant stayed at her house until September 5, as she did not "remember there being a time frame between bringing him home and what happened." K.N.

reiterated that she remembered picking up defendant on September 5, not September 1. K.N. noted that she obtained a new phone after defendant took her old phone on August 2, 2020. K.N. suggested that, because both phones were iPhones, they "would have been all synced," and it could have been that the data extraction showed a phone in Wisconsin on September 1 because defendant still possessed her old phone.

¶ 22        Defense counsel also sought clarification regarding K.N.'s testimony about the condition of her laptop before and after the assault. During cross-examination, K.N. testified that she did not know her laptop was broken until officers went through the house with her. Counsel responded, "But you stated [on direct examination] that after the sexual assault, when you were upstairs for over a day, you had no phone because he had taken it, and you testified that you didn't have a computer because he had broken it." K.N. clarified: "He had taken my computer and both of the girls['] tablets from me. I had tried to use them and he took them from me." Therefore, according to K.N., she had no electronics to contact anyone with.

¶ 23        Counsel also questioned K.N. about the cause of her vaginal bleeding. K.N. testified that she recalled telling Officer Smith that she had some vaginal bleeding and recalled "thinking I possibly had started my period." K.N. acknowledged that, though she was in her bed throughout the day following the assault, there was no blood on the sheet. K.N. could not recall whether she noticed blood throughout the day while using the restroom, but she noted that "it doesn't mean that there wasn't blood." K.N. explained that she first noticed that she had been bleeding when it stained through her jeans.

¶ 24        Counsel then showed K.N. several text message exchanges between K.N.'s phone and defendant's phone that were extracted from K.N.'s phone. In one exchange, dated September 6, 2020, texts from defendant's phone asked what drinks, ice cream, and other items he should

purchase. Some messages included pictures of various flavors of ice cream at what appeared to be a grocery store. Texts from K.N.'s phone were responsive to defendant's questions. K.N. testified that she did not send any of the text messages that were "alleged[ly] from me." K.N. noted that defendant had possession of her phone at the time the texts were sent and stated that, to her knowledge, defendant never left the house while she was confined in her bedroom.

¶ 25 In another exchange of text messages, dated September 7, 2020, K.N. admittedly sent a message accusing defendant of threatening her, choking her, hitting her, and locking her in her room. K.N. acknowledged that she did not accuse defendant of sexually assaulting her at that time but explained that she was not ready "to admit that that's what happened."

¶ 26 Another set of messages, sent later on September 7, 2020, showed several unknown individuals texting K.N., informing her that defendant had posted K.N.'s phone number and an intimate photo of her on Facebook. K.N. acknowledged that, after learning of defendant's Facebook post, she searched on her phone "if Wisconsin would extradite" defendant. K.N. also acknowledged that she told Officer Smith that defendant had sexually assaulted her after she learned of defendant's Facebook post.

¶ 27 On redirect examination, K.N. agreed that it was difficult to discuss exact dates from a year or more ago. K.N. testified that she "remember[ed] what happened to me and what order that it happened to me. But the exact dates of that week are so fuzzy that I'm to the point that I don't remember" them.

¶ 28 The State introduced recordings of phone calls defendant made to his mother on March 10 and March 11, 2021, while he was in jail. In the March 10 call, defendant's mother told defendant that she told someone that defendant "admitted to that fire, that it wasn't intentional, though." Defendant responded, "No *** the fire was restarted after I left. The only

- 10 -

thing I set on fire was a corner of the couch and the pillow. [K.N.] sent someone to restart that fire. But I never admitted to it." In the March 11 call, defendant stated, "Nah, I barely even did the arson, I mean, I lit the li—I lit a little bit of [unintelligible] on the couch because [the dog] f*** hit the blunt out my mouth."

¶ 29     During defendant's case in chief, defendant testified that K.N. picked him up from Wisconsin on September 1, 2020, to see if they could reconcile their relationship. When they arrived at her house in Bloomington, defendant brought his PlayStation and television into the living room from the car. According to defendant, because K.N. and the children had been exposed to COVID-19, everyone was quarantining "for the most part." Defendant decided he would go to the grocery store to cash a check and buy ice cream and "adult drinks." Defendant testified that he sent photos of different ice cream flavors to K.N. to determine what he should get. Defendant then picked up a pizza, which everyone ate for dinner.

¶ 30     Defendant testified that he and K.N. got into an argument after K.N. found text messages defendant sent to other women while he was in Wisconsin. However, after they "smoked, she calmed down," and they went to bed. According to defendant, he slept upstairs with K.N., and when he woke up, he saw K.N. playing on her phone. Defendant checked on the children, then K.N. told him that she wanted him to leave. Defendant texted someone for a ride, and K.N. began yelling at defendant and telling him, "[Y]ou're not even going to fight for us." K.N. then grabbed defendant's PlayStation from under the television and attempted to throw it outside. Defendant went to grab the PlayStation as K.N. was "bear hugging" it, and K.N. fell to the ground, hitting her head on the front doorframe. Defendant grabbed the PlayStation, and K.N. grabbed a tablet and went upstairs with the children. About an hour and a half later, K.N. came back downstairs, told defendant she was leaving, and left in her vehicle with the children.

¶ 31       Defendant claimed that he then began smoking marijuana and went to the "back room" to empty gasoline from a weed whacker into a container. As he did so, the dog knocked over the gasoline container so that gasoline landed on the arm of the couch in the room. At the same time, the smoldering end of the marijuana cigarette fell onto the couch, starting a "baseball-sized" fire. Defendant patted the fire out with his hand. At about 1:30 or 2 p.m., an acquaintance picked defendant up and drove him to Platteville, Wisconsin. Defendant agreed that he texted K.N. during the ride to Wisconsin. Defendant explained that a friend called him to tell him that an intimate photo of K.N. had been posted to Facebook. Defendant denied posting the photo, explaining that he was in an area where it was "hard to contact or anything like that" because there was little cell reception. Accordingly, defendant testified "trying to log on and log off on everything would be hard."

¶ 32       On cross-examination, defendant acknowledged that, after telling Officer Smith over the phone that he did not start any fires or hurt K.N., defendant sent several text messages to K.N. The messages stated, *inter alia*, "Show this to the pigs. I've been gone and have pics of the house before I left. Whatever he says about gas lines broke. Better learn to lock s*** up," and, "Yall aint got s*** on me. S*** happens when doors are unlocked."

¶ 33       Defendant also admitted that he sent several text messages to Casas, which were admitted into evidence. Those messages stated that he "beat tf out of" K.N., that the house would "be gone" soon, and that he had "people burning the b*** down." Defendant also told Casas that he "forced her to f*** me," that the "crying was outrageous," and that "screaming help [*sic*] me last longer." Defendant claimed that he sent the texts only to see if Casas existed and to start a fight with him.

¶ 34    Defendant testified that, although he and K.N. had "makeup sex" after he returned from Wisconsin, he did not force K.N. to have sex with him or punch her at any time. Defendant denied breaking K.N.'s laptop, but he admitted that he sent K.N. a text that said "no more laptop."

¶ 35    During closing argument, the prosecutor stated:

"Our burden here is beyond a reasonable doubt. Hang on to that word reasonable because [defendant's counsel] has some versions that she wants you to believe, we have the facts here today that I want you to take into consideration as you come to your verdict.

And what's reasonable? Is it reasonable that the guy who admits on the phone to setting a little bit of fire and putting the fire out, the guy who sends a text about gas lines being broken, the guy who sends a text about burning the place down, the house will be gone here soon too? Is it reasonable to believe that he's the guy that tore the fire detectors down and left those burners on and poured gasoline all over things?

That's—that's the reasonable version of events here, and that's why you should find the [d]efendant guilty of attempt residential arson. Because it's not reasonable at all to think that [K.N.] got home after hiding out at her dad's and her grandparents' all day and set a bunch of fires and turned burners on and then called the police. That's not the reasonable inference from the facts for you to draw today at all.

Is it reasonable to believe that the guy who sent text messages saying you should have seen and how I forced her to have sex with me and how the crying

- 13 -

made me last longer? Is it reasonable to believe that that guy committed criminal

sexual assault to a woman who had visible injuries that the nurse was able to

document?

Yes, that's the reasonable version of events, that's your reasonable

inference from the facts that have been given to you."

Defendant's counsel did not object.

¶ 36      The jury found defendant not guilty of residential burglary but guilty of criminal

sexual assault, attempted residential arson, unlawful restraint, and two counts of domestic

battery. The trial court sentenced defendant to an eight-year prison sentence for criminal sexual

assault, a consecutive three-year prison sentence for attempted residential arson, a concurrent

one-year prison sentence for unlawful restraint, and "court costs and conviction" for the domestic

battery counts.

¶ 37      This appeal follows.

¶ 38                                II. ANALYSIS

¶ 39                          A. Sufficiency of the Evidence

¶ 40      Defendant argues that the evidence was insufficient to support his conviction for

criminal sexual assault. The State responds that the evidence was sufficient to sustain

defendant's conviction.

¶ 41      When we review a challenge to the sufficiency of the evidence, the relevant

inquiry is whether, when viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt. *People v. Sauls*, 2022 IL 127732, ¶ 52. A reviewing court does not retry the defendant

when considering the sufficiency of the evidence. *Sauls*, 2022 IL 127732, ¶ 52. It is the

responsibility of the trier of fact to determine the credibility of witnesses, resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Sauls*, 2022 IL 127732, ¶ 52. Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Sauls*, 2022 IL 127732, ¶ 52. The positive, credible testimony of a single witness is sufficient to convict a defendant, even if contradicted by the defendant. *Sauls*, 2022 IL 127732, ¶ 52. We will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Sauls*, 2022 IL 127732, ¶ 52.

¶ 42 To prove defendant guilty of criminal sexual assault, the State had to show that defendant (1) committed an act of sexual penetration and (2) used force or the threat of force. 720 ILCS 5/11-1.20(a)(1) (West 2018).

¶ 43 Highlighting several purported inconsistencies in K.N.'s testimony, defendant contends that K.N.'s testimony was so inconsistent as to prevent any jury from reasonably finding her to be credible. Defendant asserts that, absent any DNA or other forensic evidence to corroborate K.N.'s allegation of sexual assault, the evidence could not sustain his conviction. This argument is unavailing.

¶ 44 Inconsistencies in and contradictions of testimony do not destroy a witness's credibility as a matter of law; instead, the credibility of witnesses and the weight to be given their testimony are for the jury to decide. *People v. Lewis*, 2019 IL App (4th) 150637-B, ¶ 73. With this in mind, we consider defendant's specific arguments for why the jury could not have found K.N. credible.

¶ 45       Defendant argues that K.N.'s claim that the vaginal bleeding she experienced was not the result of her menstrual period was contradicted by (1) K.N.'s testimony that she remembered "thinking" that she "possibly had started [her] period," (2) Bausley's testimony that K.N. told her on September 7, 2020, that she was experiencing her menstrual period "assuming probably now," and (3) Bausley's acknowledgement that blood observed on K.N.'s labia and cervix "[c]ould be" attributed to K.N. being on her menstrual cycle. However, K.N. testified that she was not experiencing her menstrual period at the time of the sexual assault and that she did not have any vaginal bleeding prior to the assault. Additionally, although Bausley agreed that blood on K.N.'s vaginal area could be the result of K.N.'s menstrual cycle, Bausley also testified that she observed a "notch" or dip in K.N.'s hymen that could have been an indicator of physical trauma. Further, defendant admitted that he sent text messages to Casas in which he stated that he "forced [K.N.] to f*** me," that K.N.'s "crying was outrageous," and K.N.'s "screaming help [*sic*] me last longer." It was the jury's responsibility to resolve the apparent conflict in the evidence regarding the source of K.N.'s vaginal bleeding and to determine whether defendant committed an act of sexual penetration by force. The jury was free to accept K.N.'s explanation that the bleeding was caused by the sexual assault committed by defendant. Moreover, even if the jury found that K.N.'s bleeding was due to her menstrual cycle, physical injury is not required to prove that a victim was forced to have sexual intercourse. *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993); see also *People v. Hardeman*, 203 Ill. App. 3d 482, 488 (1990) (rejecting defendant's argument that lack of physical evidence of injury to victim's vaginal area contradicted victim's claim that defendant put his penis inside her vagina).

¶ 46       Defendant also contends that K.N. could not be viewed as credible because her testimony that she picked up defendant on September 5, 2020, and allowed him to stay at her

home for only one night was contradicted by location data from K.N.'s phone showing that she was in Wisconsin on September 1, 2020. However, K.N. testified several times that she had difficulty remembering dates from a year or more before trial. K.N. noted that, while she "remember[ed] what happened to me and what order that it happened to me," the "exact dates of that week are so fuzzy that I'm to the point that I don't remember." Notably, the location data evidence defendant relies upon in making this argument was never introduced at trial. Additionally, K.N. testified that the source of the location data could have been K.N.'s old iPhone, which defendant had taken on August 2, 2020, and which "would have been all synced" with her new phone. The jury was free to conclude that K.N. was simply unsure about the exact date she picked up defendant, and it was free to believe K.N.'s testimony regarding the sexual assault. See, *e.g.*, *People v. Byer*, 75 Ill. App. 3d 658, 670 (1979) (noting that a witness's mistake as to when a conversation occurred did not compel the conclusion that the conversation never occurred). This is especially so considering other evidence which tended to corroborate K.N.'s version of events, including K.N.'s physical injuries, which she claimed were the result of defendant's beating her prior to the sexual assault, and defendant's own admission that he texted Casas, *inter alia*, that he "forced [K.N.] to f*** me."

¶ 47 Defendant further argues that K.N. was not credible because text messages sent on September 6, 2020, showed that defendant was at a grocery store and that K.N. was responding to defendant's questions about what to purchase when K.N. claimed to be confined in her bedroom at home. However, K.N. testified that she did not have her phone on September 6, 2020. K.N. denied sending the messages attributed to her and noted that defendant possessed her phone at that time. The jury could reasonably have inferred that defendant sent both sets of text messages. K.N. further testified that defendant did not leave the house on September 6, 2020. It

- 17 -

was the jury's responsibility to assess this evidence, and the jury was free to believe K.N.'s testimony and give these messages little weight.

¶ 48    Defendant also contends that K.N. presented contradictory testimony about whether her laptop was still intact. Defendant claims that K.N. testified that she could not use her laptop to contact anyone while she was confined in her bedroom because defendant had broken it. However, K.N. also testified that it was in "brand new" condition when she left the home and went to her grandparents' residence. Defendant misinterprets K.N.'s testimony. K.N. never explicitly testified that she could not contact anyone with her laptop while she was confined to her bedroom *because* defendant broke her laptop. K.N. only stated, in response to the prosecutor's question about whether she had a computer, that she did have a computer that defendant had broken. Indeed, K.N. explained that defendant had broken her computer at "some point after I had left" the house following her confinement. K.N. clarified on cross-examination that she did not use her computer to seek help while she was in her bedroom because defendant had taken it from her, not because it was broken at that time.

¶ 49    Finally, defendant suggests that K.N. had a motive to falsely accuse defendant of sexual assault because K.N. learned that her phone number and an intimate photo of her were posted on defendant's Facebook page. However, it was for the jury to assess the evidence and determine K.N.'s credibility, and we will not substitute our judgment for that of the jury regarding its credibility determination. *Sauls*, 2022 IL 127732, ¶ 52.

¶ 50    We hold that the evidence was sufficient to sustain defendant's conviction for criminal sexual assault. At trial, K.N. testified that, on September 6, 2020, defendant "body-slammed" her, punched her, and stomped on her knee. K.N. testified that defendant then confined her in her bedroom for a day. K.N. explained that, after going to the bathroom,

defendant directed her back to the bedroom without her pants on, pushed her head onto the mattress while holding her hands down, and placed his penis in her vagina despite K.N.'s crying and asking him "not to do what he was about to do." K.N. testified that defendant continued for 5 to 10 minutes before he ejaculated and went back downstairs to play a video game. K.N. noted that, though she was not experiencing vaginal bleeding before the assault, she was bleeding afterward. The evidence showed that K.N. told Bausley that defendant had held her down and penetrated her vagina with his penis. Bausley observed bruising on K.N.'s body along with a swollen knee, which corroborated K.N.'s version of events that defendant had beaten her before sexually assaulting her. Bausley also noticed a "notch" or dip in K.N.'s hymen, which Bausley testified could be an indicator of physical trauma, as well as blood on K.N.'s labia and cervix. Moreover, defendant admitted to sending text messages to Casas indicating, *inter alia*, that he "forced [K.N.] to f*** me."

¶ 51        From this evidence, the jury could reasonably conclude that defendant penetrated K.N.'s vagina with his penis through use of force. Accordingly, the evidence was sufficient to sustain defendant's conviction for criminal sexual assault.

¶ 52        B. Prosecutor's Comments During Opening Statement and Closing Argument

¶ 53        Defendant argues that he was denied a fair trial because the State improperly vouched for K.N.'s credibility during its opening statement and diluted the reasonable doubt standard in its closing argument.

¶ 54        Defendant concedes that these issues were not preserved for review, but he asks this court to review them for plain error. See *People v. Richmond*, 341 Ill. App. 3d 39, 46 (2003) (stating to preserve an issue for review, defendant must both timely object at trial and include the objection in a posttrial motion).

¶ 55          The plain-error doctrine allows a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) a clear or obvious error occurred, and the error is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Shaw*, 2016 IL App (4th) 150444, ¶ 69. A defendant seeking plain-error review bears the burden of showing that the underlying forfeiture should be excused. *Shaw*, 2016 IL App (4th) 150444, ¶ 69. The first step of plain-error analysis is to determine whether any error occurred. *Shaw*, 2016 IL App (4th) 150444, ¶ 69.

¶ 56          Initially, we note that defendant claims that the prosecutor's comments constituted "prosecutorial misconduct." We reject that characterization. As we have previously explained, Black's Law Dictionary defines "misconduct" as " 'dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust,' and '[a]n attorney's dishonesty or attempt to persuade a court or jury by using deceptive or reprehensible methods.' " *People v. Williams*, 2020 IL App (4th) 180554, ¶ 74 (quoting Black's Law Dictionary (11th ed. 2019)). *Brady* violations or *Batson* violations have been described as misconduct, as opposed to an allegation that the State made improper comments during opening statement and closing argument. *Williams*, 2020 IL App (4th) 180554, ¶ 74. Accordingly, we once again "encourage defendants to allege prosecutorial misconduct occurred only when the circumstances justify that pejorative description." *Williams*, 2020 IL App (4th) 180554, ¶ 75.

¶ 57          Defendant first contends that the State improperly vouched for K.N.'s credibility during its opening statement. Specifically, defendant takes issue with the prosecutor's statement that when the jury listened to K.N., a "victim," "tell you what happened and you look at the

diagrams of the nurse and what injuries she documented," her "version of events here is the credible version of events." Defendant also challenges the prosecutor's comment that, although K.N. initially lied to police officers and "was not always forthcoming" with them about what happened to her, she would "admit her lies," "admit her mistakes," and "be honest with you when she takes the stand and testifies."

¶ 58 The purpose of an opening statement is to give the jury a brief introduction of the disputed factual issues and what each party expects the evidence to prove. *People v. James*, 2017 IL App (1st) 143391, ¶ 67. "The parties do not enjoy the same 'wide latitude' in commenting on the case as they do in closing arguments." *James*, 2017 IL App (1st) 143391, ¶ 67 (quoting *People v. Jones*, 2016 IL App (1st) 141008, ¶ 22). Comments that tend to bolster a witness's credibility are improper. *James*, 2017 IL App (1st) 143391, ¶ 67. For a prosecutor's comments regarding a witness's credibility to be improper, the prosecutor must *explicitly* state that he or she is asserting his or her personal views. *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 51. If a prosecutor's remarks are such that the jury would have to infer that he was personally vouching for a witness's credibility, the remarks are not improper. *People v. Pope*, 284 Ill. App. 3d 695, 707 (1996). Additionally, improper comments require a new trial "only if the jury could have reached a contrary verdict in their absence" or, in other words, if the comments contributed to the defendant's conviction. (Internal quotation marks omitted.) *James*, 2017 IL App (1st) 143391, ¶ 67 (quoting *Jones*, 2016 IL App (1st) 141008, ¶ 23); see also *People v. Long*, 2018 IL App (4th) 150919, ¶ 62 (noting incidental and uncalculated remarks in an opening statement cannot form the basis of reversal absent deliberate misconduct and "substantial prejudice" to the defendant, such that the "result would have been different absent the complained-of remark").

¶ 59          We conclude that the prosecutor's comments during her opening statement did not constitute clear or obvious error. Here, the prosecutor did not explicitly state that it was her personal view that K.N. was credible. Thus, the jury would have had to infer that the prosecutor was personally vouching for K.N.'s credibility. Additionally, the prosecutor's comments could be interpreted as conveying that the evidence would show that K.N. understood that she committed a mistake in failing to be honest with officers, and thus was testifying honestly. Moreover, given the strength of the State's case—which included (1) Bausley's observations corroborating K.N.'s claims that defendant beat and sexually assaulted her, (2) defendant's admission that he sent text messages claiming to have sexually assaulted K.N., and (3) Coe's testimony that the cause of the fire in K.N.'s home was incendiary—we cannot say that defendant suffered substantial prejudice or that the jury would have reached a different verdict absent the State's comments.

¶ 60          Further, even if the comments constituted clear or obvious error, defendant is not entitled to relief pursuant to the plain-error doctrine. See *Richmond*, 341 Ill. App. 3d at 47-48 (stating although State's delivery of opening statement from the first-person perspective of the victim was improper, it did not constitute plain error).

¶ 61          Defendant cannot establish first-prong plain error because the evidence was not closely balanced. As previously noted, K.N. testified that defendant "body-slammed" her, punched her, and stomped on her knee before he confined her in her bedroom for a day. K.N. explained that, later, after she went to the bathroom, defendant directed her back into the bedroom, held her down, and placed his penis in her vagina despite K.N.'s crying and asking him "not to do what he was about to do." K.N. testified that she began to experience vaginal bleeding after the assault. The evidence showed that K.N. informed Bausley that defendant held her down

- 22 -

and penetrated her vagina with his penis. Bausley observed injuries that were consistent with K.N.'s account, including a "notch" in K.N.'s hymen that was possibly an indicator of physical trauma and blood on K.N.'s labia and cervix. Defendant admitted to sending text messages to Casas indicating that he "forced [K.N.] to f*** me." Coe testified that he observed fire damage in the house, including a burned couch, melted blinds behind the couch, and burns on the floor that were not consistent with someone having dropped a lit cigarette. Coe testified that, in his opinion, the fire had several points of origin. Coe further explained that liquid accelerant was used and that the fire was incendiary in nature, as the only ignition source that could not be ruled out was exposure to open flame from, for example, a match, candle, or lighter. Additionally, in text messages and jail phone calls admitted into evidence, defendant claimed to have had "people burning the b*** down" and noted that he had set fires in K.N.'s home.

¶ 62          Similarly, defendant cannot establish that the prosecutor's comments rose to such a magnitude as to deprive him of a fair trial and constitute second-prong plain error. The record shows that the jury was instructed that opening statements and closing arguments are not evidence, and any statement or argument made by the attorneys that is not based on the evidence should be disregarded. The jury was also instructed that "[o]nly you are the judges of the believability of the witnesses and the weight to be given to the testimony of each of them." The jury is presumed to follow instructions. *People v. Brandon*, 283 Ill. App. 3d 358, 364 (1996). Accordingly, we find no plain error.

¶ 63          Defendant also contends that the prosecutor diluted the reasonable-doubt standard in its closing argument by implying that its burden of proof was met if the jury believed that its version of events was more reasonable than defendant's version. Specifically, defendant complains of the prosecutor commenting that the State's "burden here is beyond a reasonable

doubt," then asking whether defendant's commission of residential arson and sexual assault was the "reasonable version of events" in light of the evidence presented.

¶ 64        A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences the evidence yields. *People v. Burney*, 2011 IL App (4th) 100343, ¶ 65. Reversible error is found only if the defendant shows that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error. *Burney*, 2011 IL App (4th) 100343, ¶ 65. Additionally, a " 'trial court can cure erroneous statements made during arguments by giving proper jury instructions on the law ***, telling the jury arguments are not evidence and should be disregarded if not supported by the evidence, or by sustaining an objection and instructing the jury to disregard the improper statement.' " *People v. Price*, 2021 IL App (4th) 190043, ¶ 154 (quoting *People v. Kallal*, 2019 IL App (4th) 180099, ¶ 35).

¶ 65        Courts disfavor attempts to explain the reasonable-doubt standard because the attempt, even if well-intentioned, "may distort the standard to the prejudice of the defendant." *Burney*, 2011 IL App (4th) 100343, ¶ 67. Even so, counsel is entitled to discuss reasonable doubt, to present his or her view of the evidence, and to suggest whether the evidence supports reasonable doubt. *Burney*, 2011 IL App (4th) 100343, ¶ 67. Further, counsel may comment on the weight of the evidence adduced at trial and compare the relative weight of the evidence supporting each party's theory of the case. *People v. Zoph*, 381 Ill. App. 3d 435, 454 (2008).

¶ 66        We conclude that the prosecutor's statements during closing argument did not constitute clear or obvious error. We find *Price* instructive. In *Price*, during the State's closing argument, the prosecutor argued, "There's no way to remove all doubt. The only way to know without any doubt is to be a witness." *Price*, 2021 IL App (4th) 190043, ¶ 100. The trial court

sustained an objection from the defendant and informed the jury, "[A]rguments of lawyers will not to [*sic*] be taken as statements of law. Instructions on the law will come from me after final arguments are completed." *Price*, 2021 IL App (4th) 190043, ¶ 100. Thereafter, the prosecutor argued:

> "When you're looking at all this, don't just consider what's possible. Consider what's probable. Look at it all together. What makes sense? Everyone in this courtroom could have possibly been the person that murdered [the victim]. Who in this courtroom does the evidence point to and show is probable? That's what you need to look at." *Price*, 2021 IL App (4th) 190043, ¶ 100.

The trial court then sustained the defendant's objection that the State was "lowering the burden." *Price*, 2021 IL App (4th) 190043, ¶ 100.

¶ 67        On appeal, this court rejected the defendant's argument that he was denied a fair trial because the prosecutor's comments lowered the State's burden of proof. *Price*, 2021 IL App (4th) 190043, ¶ 151. We concluded that defendant failed to establish that the comments were so prejudicial as to deny real justice or that the verdict resulted from the error. *Price*, 2021 IL App (4th) 190043, ¶ 157. We explained that the trial court "cured any prejudicial effects" of the comments by instructing the jury "that arguments of the parties are not evidence." *Price*, 2021 IL App (4th) 190043, ¶¶ 157-59. We further explained that although the State argued that the jury should consider what was more "probable," the prosecutor nevertheless correctly informed the jury that the State had the burden of proving defendant's guilt beyond a reasonable doubt. *Price*, 2021 IL App (4th) 190043, ¶ 159.

¶ 68        Like *Price*, defendant cannot show that he suffered such prejudice from the State's comments as would deny him real justice or that the verdict resulted from the comments.

As previously noted, given the strength of the State's case, we do not believe that the jury would have reached a different verdict absent the comments. Additionally, the trial court cured any prejudicial effects resulting from the comments by properly instructing the jury that the State had the burden of proving defendant's guilt beyond a reasonable doubt and that arguments of the parties are not evidence. We also note that the prosecutor correctly addressed the State's burden of proof by informing the jury, "Our burden here is beyond a reasonable doubt."

¶ 69        Moreover, even if we assume, *arguendo*, that the prosecutor's comments amounted to clear or obvious error, defendant is not entitled to relief pursuant to the plain-error doctrine. As previously discussed, the evidence was not closely balanced, and therefore, defendant cannot establish first-prong plain error. Defendant cannot show that the comments amounted to second-prong plain error, as he cannot show that the error was of such a magnitude as to deprive defendant of a fair trial. Any detrimental impact of the prosecutor's comments was minimized because the trial court properly instructed the jury that the State had the burden of proving defendant's guilt beyond a reasonable doubt and that closing arguments are not evidence. See *Shaw*, 2016 IL App (4th) 150444, ¶ 72 (noting that even if State's closing argument was improper, the trial court properly instructing the jury minimized the impact of any improper comments such that defendant could not show second-prong plain error). Accordingly, we find no plain error.

¶ 70                                    III. CONCLUSION

¶ 71        For the reasons stated, we affirm defendant's conviction and sentence.

¶ 72        Affirmed.